Filed 7/8/20 (unmodified opn. attached)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| STANFORD VINA RANCH IRRIGATION COMPANY,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>STATE OF CALIFORNIA et al.,<br><br>Defendants and Respondents. | C085762<br><br>(Super. Ct. No. 34201480001957CUWMGDS)<br><br>ORDER MODIFYING OPINION<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the published opinion filed herein on June 18, 2020, be modified as follows:

On page 34, the last sentence of the first full paragraph beginning with "We agree with the trial court's determination" and immediately preceding the citation to *In re*

*Waters of Long Valley Creek System* (1979) 25 Cal.3d 339 is deleted.  The following sentence is inserted in its place:

> We agree with the trial court's determination that although "the court's judgment settled questions of apportionment among the parties to the litigation," it does not prevent the Board from adopting regulations and issuing curtailment orders to prevent an unreasonable use of water under article X, section 2.

This modification does not change the judgment.

FOR THE COURT:


  /s/
RAYE, P. J.


  /s/
DUARTE, J.


  /s/
HOCH, J.

Filed 6/18/20 (unmodified opinion)

<u>CERTIFIED</u> <u>FOR</u> <u>PUBLICATION</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| STANFORD VINA RANCH IRRIGATION COMPANY, | |
| Plaintiff and Appellant, | C085762 |
| v. | (Super. Ct. No. 34201480001957CUWMGDS) |
| STATE OF CALIFORNIA et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Sacramento County, Timothy M. Frawley, Judge. Affirmed.

MINASIAN, MEITH, SOARES, SEXTON & COOPER, Paul R. Minasian and Jackson A. Minasian for Plaintiff and Appellant.

Anthony L. François and Jeremy Talcott for Pacific Legal Foundation; DOWNEY BRAND, Kevin M. O'Brien, David R.E. Aladjem, Samuel Bivins for Northern California Water Association; O'LAUGHLIN & PARIS, Tim O'Laughlin, Valerie C. Kincaid, and Ryan E. Stager for San Joaquin Tributaries Authority as Amici Curiae on behalf of Plaintiff and Appellant.

1

Xavier Becerra, Attorney General, Robert W. Byrne, Senior Assistant Attorney General, Randy L. Barrow, Supervising Deputy Attorney General, Carolyn Nelson Rowan and William Jenkins, Deputy Attorneys General, for Defendants and Respondents.


Stanford Vina Ranch Irrigation Company (Stanford Vina) sued the State Water Resources Control Board (the Board), among other defendants, challenging the Board's issuance of certain temporary emergency regulations in 2014 and 2015, during the height of one of the most severe droughts in California's history. The challenged regulations established minimum flow requirements on three tributaries of the Sacramento River, including Deer Creek in Tehama County, in order to protect two threatened species of anadromous fish, Chinook salmon and steelhead trout, during their respective migratory cycles. Stanford Vina further challenged the Board's implementation of those regulations by issuing temporary curtailment orders limiting the company's diversion of water from Deer Creek for certain periods of time during those years in order to maintain the required minimum flow of water. Judgment was entered in favor of the Board and other defendants. Stanford Vina appeals.

We affirm. As we shall explain, the Board possesses broad authority to regulate the unreasonable use of water in this state by various means, including the adoption of regulations establishing minimum flow requirements protecting the migration of threatened fish species during drought conditions and declaring diversions of water unreasonable where such diversions would threaten to cause the flow of water in the creeks in question to drop below required levels. Adoption of such regulations is a quasi-legislative act that is reviewable by ordinary mandamus. Concluding the Board's adoption of the challenged regulations was not arbitrary, capricious, or lacking in evidentiary support, nor did the Board fail to follow required procedures, we cannot

override the Board's determination as to reasonableness set forth in the regulations.  We also reject Stanford Vina's assertion the Board was required to hold an evidentiary hearing before making this reasonableness determination.  Contrary to Stanford Vina's arguments in this appeal, neither the due process guarantees of the federal and California Constitutions, nor article X, section 2 of the California Constitution[1] requires such a hearing prior to adoption of a regulation governing reasonable water use.

The Board's issuance of the challenged curtailment orders, a quasi-adjudicative act, is reviewable by administrative mandamus.  However, as we explain, because Stanford Vina possessed no fundamental vested right to an unreasonable use of water from Deer Creek, our function is simply to determine whether the record is free from legal error and whether the Board's findings are supported by substantial evidence.  As for the latter determination, the evidence is more than sufficient to support the Board's findings.  As for the former, we reject Stanford Vina's assertion that the curtailment of water in this case amounted to a "taking" of Stanford Vina's property rights requiring just compensation.  Finally, we are also unpersuaded by each of the remaining arguments raised by Stanford Vina and the various amicus parties who submitted briefs on the company's behalf.[2]

---

[1]    Undesignated article/section references are to the California Constitution.

[2]    We received amicus curiae briefing from San Joaquin Tributaries Authority, Pacific Legal Foundation, and Northern California Water Association.  Having read and considered the arguments made therein, most of which echo arguments made by Stanford Vina in its briefing on appeal, we decline to specifically address the amicus parties' arguments in this opinion.  It will suffice to note none of those arguments has persuaded this court the judgment in this matter should be reversed.

3

BACKGROUND

*The Board's Administrative Authority*

We begin with a brief overview of the Board's administrative authority in order to place the facts of this case in their proper context.

"The Board was created as the State Water Commission in 1913 to administer the appropriation of water for beneficial purposes. As originally created, the Board had the 'limited role' of granting use rights to water that was not being applied to beneficial purposes and was not otherwise appropriated. [Citation.] '[T]he function of the [Board] was restricted to determining if unappropriated water was available; if it was, and no competing appropriator submitted a claim, the grant of an appropriation was a ministerial act.' [Citation.] The enactment of Article X, Section 2, [of the California constitution] however, 'radically altered water law in California and led to an expansion of the powers of the board.' [Citation.]" (*Light v. State Water Resources Control Bd.* (2014) 226 Cal.App.4th 1463, 1481 (*Light*).)

As we explain more fully later in this opinion, this constitutional provision limits the "right to water or to the use or flow of water in or from any natural stream or water course" in California "to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (Art. X, § 2.)

Following the enactment of this constitutional provision, "[t]hrough subsequent legislation and judicial decisions, 'the function of the [Board] has steadily evolved from the narrow role of deciding priorities between competing appropriators to the charge of comprehensive planning and allocation of waters.' [Citation.]" (*Light*, *supra*, 226 Cal.App.4th at p. 1481.) The Board's enabling statute "grants it the power to 'exercise the adjudicatory and regulatory functions of the state in the field of water resources.'

4

[Citation.] In that role, the Board is granted 'any powers . . . that may be necessary or convenient for the exercise of its duties authorized by law' [citation], including the power to 'make such reasonable rules and regulations as it may from time to time deem advisable. . . .' [Citation.] Among its other functions, 'the . . . board shall take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state.' [Citation.]" (*Light*, *supra*, 226 Cal.App.4th at pp. 1481-1482; Wat. Code, §§ 174, 186, 275, 1058.)[3]

### *Deer Creek Watershed*

Deer Creek is a tributary of the Sacramento River originating near the summit of Butt Mountain in the Lassen National Forest. The creek runs generally in a southwesterly direction for about 60 miles, traversing dense forest before descending through a steep rock canyon into the Sacramento Valley, crossing the valley floor, and finally entering the Sacramento River near the town of Vina.

Two irrigation companies, Stanford Vina and Deer Creek Irrigation District, operate diversion dams and ditches for agricultural use between the canyon mouth and the Sacramento River. By virtue of a judicial decree, originally entered in 1923 and amended in 1926, Stanford Vina is entitled to use roughly 66 percent of the flow of Deer Creek.

Two species of anadromous fish, Chinook salmon and steelhead trout, make their way from the ocean to Deer Creek each year to spawn. Central Valley spring-run Chinook salmon enter Deer Creek from late-February through early-July and spend the summer in pools in the upper watershed before spawning in late-September. Central

---

[3] Undesignated statutory references are to the Water Code.

Valley fall-run Chinook salmon, as their name suggests, make their run during the fall, but do not travel into the upper watershed, instead spawning in the lower portions of the creek. Finally, California Central Valley steelhead trout also migrate upstream during the fall, but travel much farther up the creek and spawn in its upper reaches during the winter months.[4]

The spring-run salmon and steelhead trout noted above are listed as threatened species under the California Endangered Species Act (Fish & G. Code, § 2050 et seq.) and the federal Endangered Species Act (16 U.S.C. § 1531 et seq.). As the trial court noted in its statement of decision, the California Department of Fish and Wildlife (DFW) and two federal agencies, the United States Fish and Wildlife Service and the National Marine Fisheries Service (federal fisheries services), "have been studying the conditions in California waterways," including Deer Creek, "and working to protect and restore anadromous (salmon and steelhead) fish populations" for many years. A 1993 report prepared by DFW estimated Deer Creek "could support sustainable populations of 4,000 spring-run and 6,500 fall-run . . . salmon" and "identified 'inadequate flow' for upstream passage as the 'most significant problem' " preventing those numbers from being attained. Indeed, "in the decade prior to the report, it was estimated that only about 550 spring-run and 1,000 fall-run salmon annually spawned in the creek." The report further "stated that '[f]lows necessary to provide unimpaired migration for adult salmon and steelhead are unknown but have been estimated to be approximately 50 cfs [cubic feet per second]."

A 2009 watershed profile concluded Deer Creek has "*high* potential" for supporting viable populations of both spring-run salmon and steelhead trout because

---

[4]     For ease of reference, we shall refer to the aforedescribed fish as "spring-run salmon," "fall-run salmon," and "steelhead trout."

"[h]abitat used for holding and spawning is located at high elevations and habitat is considered to be high quality." However, because of the water diversion structures operated by Stanford Vina and Deer Creek Irrigation District in the valley section of the creek, "[d]uring low flow periods, the existing water rights [of these companies] are sufficient to dewater the stream" to the point of blocking access to upper portions of the watershed for late-migrating spring-run salmon. Low water flows also negatively affect the outmigration of juvenile spring-run salmon and steelhead trout.

### The Drought Emergency

California's most recent drought, persisting from the end of 2011 to the beginning of 2017, "was especially severe, as it included the driest four-year period [fall of 2011 to fall of 2015] in California since recordkeeping began in 1895, as well as the two warmest years [2014 and 2015] in state history."[5]

In January 2014, Governor Brown declared a state of emergency due to the severe and persistent drought conditions. The Governor noted, among other urgent problems caused by the drought, "animals and plants that rely on California's rivers, including many species in danger of extinction, will be threatened" by the "significantly reduced surface water flows" in the state's river systems. Among other directives, the Governor ordered the Board to "put water right holders throughout the state on notice that they may be directed to cease or reduce water diversions based on water shortages" and "consider . . . diversion limitations" in order to "enable water to be conserved upstream later in the year to protect cold water pools for salmon and steelhead, maintain water supply, and

---

[5] (Szeptycki & Gray, *California's Drought and the Environment: An Introduction* (2017) 23 Hastings No. 1, W.-N.W. J. Envtl. L. & Pol'y 51, internal fns. omitted; Hanak, Mount & Chappelle, *California's Latest Drought* (July 2016) Public Policy Institute of California <https://www.ppic.org/publication/californias-latest-drought> [as of June 17, 2020], archived at <https://perma.cc/98VG-D4RA>.)

improve water quality." The Governor also suspended the application of the California Environmental Quality Act (CEQA) in order for the Department of Water Resources (DWR) and the Board to expeditiously act to mitigate the effects of the drought and further directed DFW to "evaluate and manage the changing impacts of drought on threatened and endangered species and species of special concern."

In March 2014, Governor Brown signed urgency legislation, Senate Bill No. 104 (2013 – 2014 Reg. Sess.), enacting and amending various statutes in order to expedite drought relief. Uncodified section 1 of the bill states: "The Legislature finds and declares that California is experiencing an unprecedented dry period and shortage of water for its citizens, local governments, agriculture, environment, and other uses. The purpose of this act is to enact urgent legislation to appropriate funds and expedite administrative actions to increase water supply reliability consistent with the state's economic, health and safety, and resource protection laws." (Sen. Bill No. 104 (2013-2014 Reg. Sess.) § 1.)

Among other statutory amendments, Sen. Bill No. 104 (2013-2014 Reg. Sess.) amended section 1058.5 to provide, in relevant part: "This section applies to any emergency regulation adopted by the board for which the board makes both of the following findings: [¶] (1) The emergency regulation is adopted to prevent the waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion, of water, to promote water recycling or water conservation, to require curtailment of diversions when water is not available under the diverter's priority of right . . . . [¶] (2) The emergency regulation is adopted in response to conditions which exist, or are threatened, in a critically dry year immediately preceded by two or more consecutive below normal, dry, or critically dry years or during a period for which the Governor has issued a proclamation of a state of emergency under the California Emergency Services

8

Act . . . based on drought conditions." (§ 1058.5, subd. (a); Sen. Bill No. 104 (2013-2014 Reg. Sess.) § 10.)

In April 2014, Governor Brown declared a continued state of emergency. Among other directives, the Governor ordered DFW to "work with other state and federal agencies and with landowners in priority watersheds to protect threatened and endangered species and species of special concern and maximize the beneficial uses of scarce water supplies, including employment of voluntary agreements to secure instream flows, relocation of members of those species, or through other measures." The Governor again suspended application of CEQA to specified actions and further ordered the Board to "adopt and implement emergency regulations pursuant to . . . section 1058.5, *as it deems necessary to prevent the waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water*, to promote water recycling or water conservation, *and to require curtailment of diversions* when water is not available under the diverter's priority of right." (Italics added.)

### The Challenged Emergency Regulations and Curtailment Orders

In May 2014, the Board began the process of promulgating emergency regulations implementing in-stream flow requirements for Deer Creek and two other creeks in Tehama County, Mill and Antelope Creeks. The proposed flow requirements were in line with a memorandum submitted to the Board by one of the federal fisheries services noted above.[6] Water rights holders were notified of the proposed emergency regulations

---

[6]    With respect to Deer Creek, the memorandum provided evidence supporting a minimum flow requirement of 50 cfs from April 1 through June 30 and October 1 through November 30 to protect adult salmon migration and the same minimum flow requirement from October 1 through March 30 to protect adult steelhead migration. The memorandum also provided evidence supporting a minimum flow requirement of 20 cfs for juvenile fish outmigration from October 1 through June 30 and pulse flows in addition

9

and their right to offer comments. Stanford Vina submitted a comment letter objecting to the proposed regulations and made an oral presentation at the May 20 Board meeting. The Board adopted the regulations the following day.

Section 877 of the 2014 emergency regulations began by providing: "The [Board] has determined that it is a waste and unreasonable use under Article X, section 2 . . . to continue diversions that would cause or threaten to cause flows to fall beneath the drought emergency minimum flows listed in subdivision (c), except as provided in section 878.1. [¶] (a) For the protection of threatened and endangered fish, no water shall be diverted from the streams listed below during the effective period of a curtailment order under this article, except as provided under sections 878, 878.1 or 878.2.[7] [¶] (b) The Deputy Director for the Division of Water Rights (Deputy Director) may issue a curtailment order upon a determination that without curtailment of diversions flows are likely to be reduced below the drought emergency minimum flows specified in subdivision (c). Curtailment orders shall be effective the day after issuance. Except as provided in sections 878, 878.1, and 878.2, where flows are sufficient to support some but not all diversions, curtailment orders shall be issued in order of priority. [¶] In determining which diversions should be subject to curtailment, the Deputy Director shall take into account the need to provide reasonable assurance that the actual drought emergency minimum flows will be met." (Cal. Code Regs., tit. 23, former § 877, subds. (a) & (b).)

Subdivision (c) of this section then set forth the drought emergency minimum flows. That subdivision began: "The State Board has authority to ensure the protection

---

to the base flow of up to 50 cfs for 24 hours every two weeks from April 15 through June 30.

**7** These regulatory sections provide for exceptions not applicable to the facts of this case. (See Cal. Code Regs., tit. 23, former §§ 878, 878.1, 878.2.)

10

and preservation of streams and to limit diversions to protect critical flows for species, including for state and federally threatened and endangered salmon and steelhead species. To prevent the waste and unreasonable use of water, the Deputy Director may issue curtailment orders as described in subdivision (b).  The flows described in this subdivision may be less than otherwise desirable minimum flows for fisheries protection, but have been developed to ensure a bare minimum instream flows for migratory passage during the drought emergency, given the unprecedented nature of the current drought and the drought impacts to these fisheries."  (Cal. Code Regs., tit. 23, former § 877, subd. (c).)

With respect to Deer Creek, subdivision (c) set forth the following drought emergency minimum flows:

"(A) April 1 up to June 30 , if Adult CV SR Salmon are present -

"(i) Base Flows - 50 cfs or full flow without diversions, whichever is less.

"(ii) Pulse Flows - 100 cfs or full flow without diversions, whichever is less. Pulse flows may be required when Adult CV SR Salmon are observed between Vina Dam and the Sacramento River.  When required, pulse flows are in lieu of, not in addition to, base flow requirements.  The pulse flow will last a minimum of 24 hours to a maximum of 72 hours, and will be determined by the presence of fish observed and desired migration movements upstream.  The duration will be determined by the Deputy Director in consultation with [DFW] or the National Marine Fisheries Service. . . .

"[¶] . . . [¶]

"(B) June 1 up to June 30 , if Juvenile CV SR Salmon or Juvenile CCV Steelhead are present -

"(i) Pulse Flows - 100 cfs or full flow without diversions, whichever is less.

"Pulse flows may be required when juvenile CV SR Salmon or CCV Steelhead are observed in the lower reaches of Deer Creek.  When required, pulse flows are in lieu of,

11

not in addition to, base flow requirements. The pulse flow will last a minimum of 24 hours to a maximum of 48 hours, and will be determined by the presence of fish observed and desired migration movements downstream into the Sacramento River. The duration will be determined by the Deputy Director in consultation with [DFW] or the National Marine Fisheries Service. . . .

"[¶] . . . [¶]

"(C) October 1 - March 31, if Adult CCV Steelhead are present -

"(i) Base Flows - 50 cfs or full flow without diversions, whichever is less.

"(D) November 1 - June 30, if Juvenile CV SR Salmon or Juvenile CCV Steelhead are present and adult CV SR Salmon or Adult CCV Steelhead are not present -

"(i) Base Flows - 20 cfs or full flow without diversions, whichever is less." (Cal. Code Regs., tit. 23, former § 877, subd. (c) .)

Subdivision (c) also provided for suspension of a curtailment order: "[DFW] and/or the National Marine Fisheries Service may conduct field surveys and notify the Deputy Director when the pertinent migration periods have ended," in which case "[t]he Deputy Director shall, no later than the next business day, suspend curtailment orders that are based on the need for a particular flow volume when presence of adult or juvenile CV SR Salmon and CCV Steelhead or hydrologic conditions no longer support the need for the required flows." (Cal. Code Regs., tit. 23, former § 877, subd. (c)(E).)

On June 5, 2014, the Board issued a curtailment order for Deer Creek. After noting, among other things, that the flow below Stanford Vina Dam had reached 17.7 cfs, the order directed all water rights holders in the Deer Creek watershed to "immediately cease or reduce their diversions from Deer Creek to ensure the drought emergency minimum flows specified in section 877, subdivision (c)(2) are satisfied through June 30, 2014 or until the Deputy Director suspends the curtailment order . . . ."

12

On June 24, 2014, the Board notified all water rights holders the first curtailment order was suspended due to the absence of spring-run salmon and steelhead trout in Deer Creek.

On October 14, 2014, the Board issued a second curtailment order. This order was virtually identical to the first such order and required curtailment through February 28, 2015 or suspension of the order.

In March 2015, the Board readopted the emergency regulations implementing in-stream flow requirements for Deer Creek and the other creeks noted above. The 2015 emergency regulations were substantially the same as the 2014 emergency regulations, with "minor adjustments to the minimum flows and flow periods based on an assessment of [the 2014] implementation of the regulation[s]."

On April 17, 2015, the Board issued a third curtailment order. This order was also virtually identical to the first such order and required curtailment through June 30, 2015 or suspension of the order.

Finally, on October 22, 2015, the Board issued the fourth and final curtailment order challenged in this appeal. Again virtually identical to its predecessors, this order required curtailment through March 31, 2016 or suspension of the order.

### The Present Lawsuit

The present lawsuit was filed in October 2014, after the second curtailment order was issued. An amended operative pleading was filed in May 2015, after the third curtailment order was issued. Stanford Vina, an irrigation company whose shareholders own agricultural land with riparian rights to the use of roughly 66 percent of Deer Creek's water, asserted causes of action for inverse condemnation and declaratory relief, claiming the Board's "emergency regulations and related curtailment orders" amounted to a taking of Stanford Vina's vested water rights for public "fishery enhancement purposes," and that such a taking may not occur without first "conduct[ing] evidentiary

13

hearings examining alternative uses and the public interest and benefit from comparative uses of water . . . as required in any eminent domain action in regard to public necessity." Stanford Vina also sought writs of mandate and/or injunctive relief ordering the Board, among other things, to rescind the emergency regulations and related curtailment orders and refrain from "adopting further orders relating to unreasonable use of water which have the effect of prohibiting one use of water in order to benefit or enhance an alternative use of water, without first complying with constitutional and statutory legal requirements of due process and reasonable compensation."

The trial court ordered the writ of mandate/injunctive relief causes of action bifurcated from the inverse condemnation/declaratory relief causes of action. Thereafter, Stanford Vina filed an opening brief arguing: (1) the Board abused its discretion in adopting the "curtailment regulations" in 2014 and 2015 because these regulations amounted to a taking of Stanford Vina's vested water rights without just compensation; (2) the Board violated Stanford Vina's constitutional right to due process by failing to hold an evidentiary hearing prior to taking these water rights and by failing to provide the company with adequate notice; (3) the Board could not lawfully invoke the rule of reasonableness set forth in article X, section 2, to limit Stanford Vina's water rights without first holding an evidentiary hearing; (4) the Board misapplied the rule of reasonableness; (5) the public trust doctrine does not apply to Stanford Vina's water rights; (6) the challenged regulations and curtailment orders violated the rule of priority; (7) the Board ignored a binding judgment previously adjudicating Stanford Vina's water rights; (8) the Board improperly amended the challenged 2014 regulations on the day of their adoption; and (9) the conditions existing in the Deer Creek watershed in 2014 and 2015 "did not constitute a true emergency."

In opposition, the Board and other defendants (collectively, defendants) argued the Board possessed the authority to adopt the challenged emergency regulations and issue

14

the subsequent curtailment orders to "regulate the unreasonable use of water," relying primarily on *Light*, *supra*, 226 Cal.App.4th 1463 and *People ex rel. State Water Resources Control Bd. v. Forni* (1976) 54 Cal.App.3d 743 (*Forni*). Without setting forth defendants' response to each argument advanced by Stanford Vina, we note they argued substantial evidence supported the Board's findings that a drought emergency existed and "immediate action was needed to prevent waste and unreasonable use of water diverted from priority water bodies that provide habitat for threatened and endangered species such as salmon and steelhead." Defendants further argued the Board did not violate Stanford Vina's due process rights, nor did the emergency regulations and curtailment orders amount to a taking of property, because Stanford Vina did not have a vested right to the unreasonable use of water.

The trial court denied the writ relief requested by Stanford Vina. The trial court concluded the Board possessed quasi-legislative authority to adopt the challenged emergency regulations that "themselves determined diversions would be curtailed to meet minimum flow requirements," without first holding an evidentiary hearing; although the curtailment orders appeared quasi-adjudicative in nature, they "simply notified affected water rights holders that the regulatory provisions were put into effect." Rejecting Stanford Vina's argument that the Board unlawfully declared certain diversions from Deer Creek to be unreasonable, the trial court explained: "Under the unique circumstances present in this case–persistent and extreme drought conditions threatening to dewater high priority streams during critical migration periods for threatened and endangered fish species, and a lack of feasible alternatives to increase in-stream flows by other means–the [Board] rationally determined that allowing diversions to reduce flows below the minimum, 'belly-scraping' amounts necessary for fish migrations and survivability would be 'unreasonable.' " The trial court also rejected Stanford Vina's remaining arguments, including the takings argument advanced despite the bifurcation

15

order, and ultimately entered judgment against Stanford Vina on all causes of action. This appeal followed.

DISCUSSION

**I**

*Overview of California Water Law*

We begin our discussion of Stanford Vina's appellate contentions with a brief overview of California water law in order to provide a backdrop for those contentions.

"Ownership of California's water is vested generally in the state's residents, but individuals and entities can acquire 'water rights,' the right to divert water from its natural course for public or private use. [Citations.] California maintains a 'dual system' of water rights, which distinguishes between the rights of 'riparian' users, those who possess water rights by virtue of owning the land by or through which flowing water passes, and 'appropriators,' those who hold the right to divert such water for use on noncontiguous lands. [Citation.] For historical reasons, California further subdivides appropriators into those whose water rights were established before and after 1914. Post-1914 appropriators may possess water rights only through a permit or license issued by the Board, and their rights are circumscribed by the terms of the permit or license. Riparian users and pre-1914 appropriators need neither a permit nor other governmental authorization to exercise their water rights. [Citation.]" (*Light*, *supra*, 226 Cal.App.4th at pp. 1477-1478.)

"The differences between and among riparian users and appropriators become most pronounced when the available supply of water is inadequate to satisfy the needs of all those holding water rights. Under the 'rule of priority,' which governs diversion in such circumstances, the rights of riparian users are paramount. Although riparian users must curtail their use proportionately *among themselves* in times of shortage, they are

16

entitled to satisfy their reasonable needs first, before appropriators can even begin to divert water. [Citation.] As a result, appropriators may be deprived of all use of water when the supply is short. In turn, senior appropriators–those who acquired their rights first in time–are entitled to satisfy their reasonable needs, up to their full appropriation, before more junior appropriators become entitled to any water. [Citation.]" (*Light*, *supra*, 226 Cal.App.4th at p. 1478.)

All water rights in California, both riparian and appropriative, are constrained by two limiting principles: (1) the rule of reasonableness; and (2) the public trust doctrine. (*Santa Barbara Channelkeeper v. City of San Buenaventura* (2018) 19 Cal.App.5th 1176, 1184 (*Channelkeeper*).)

The rule of reasonableness, codified in the California Constitution since 1928, is "the overriding principle governing the use of water in California." (*Forni*, *supra*, 54 Cal.App.3d at p. 750.) This rule limits "[t]he right to water or to the use or flow of water in or from any natural stream or water course in this State" to "such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (Art. X, § 2.) "[T]he reasonableness of any particular use depends largely on the circumstances. [Citation.] 'What may be a reasonable beneficial use, where water is present in excess of all needs, would not be a reasonable beneficial use in an area of great scarcity and great need. What is a beneficial use at one time may, because of changed conditions, become a waste of water at a later time.' [Citation.]" (*Light*, *supra*, 226 Cal.App.4th at p. 1479.) Moreover, as our Supreme Court explained in *Joslin v. Marin Municipal Water Dist.* (1967) 67 Cal.2d 132 (*Joslin*), "what is a reasonable use of water depends on the circumstances of each case, [but] such an inquiry cannot be resolved *in vacuo* isolated from statewide considerations of transcendent importance. Paramount among these we see the ever increasing need for

17

the conservation of water in this state, an inescapable reality of life quite apart from its express recognition in the 1928 amendment." (*Id*. at p. 140.)

The second overarching principle limiting water rights in California is the public trust doctrine. "The doctrine finds its origin in the Roman law principle that [human]kind shares ownership in the sea, the seashore, the air, and (most importantly for our purposes) running water. [Citations.] The doctrine arrived in California via the English common law, and was often applied in cases involving public rights to navigation, commerce, and fishing in tideland areas, or on navigable lakes and streams. [Citation.] But in 1983 our Supreme Court held that the doctrine also protects navigable waters, such as Mono Lake, 'from harm caused by diversion of nonnavigable tributaries.' [Citation.] The State of California as trustee has a broad 'duty . . . to protect the people's common heritage of streams, lakes, marshlands and tidelands, surrendering that right of protection only in rare cases.' [Citation.] As a consequence, those 'parties acquiring rights in trust property,' such as water flowing in a stream, 'generally hold those rights subject to the trust, and can assert no vested right to use those rights in a manner harmful to the trust.' " (*Channelkeeper*, *supra*, 19 Cal.App.5th at pp. 1185-1186, quoting *National Aububon Society v. Superior Court* (1983) 33 Cal.3d 419, 437.)

## II

### *Standard of Review*

Before turning to the specific contentions raised in this appeal, we must first determine the appropriate standard of review.

Stanford Vina asserts an independent judgment standard of review applies under Code of Civil Procedure section 1094.5, the administrative mandamus statute. In general, where the administrative agency's decision is "quasi-adjudicative" in nature, "review . . . is by administrative mandamus (Code Civ. Proc., § 1094.5) under either the substantial evidence or the independent judgment standard." (*Dominey v. Dept. of Personnel*

18

*Administration* (1988) 205 Cal.App.3d 729, 736 (*Dominey*).) Whether the substantial evidence or independent judgment standard applies turns on whether or not the decision substantially affects a fundamental vested right. If so, "the trial court must not only examine the administrative record for errors of law, but also must exercise its independent judgment upon the evidence. However, when the administrative decision neither involves nor substantially affects such a right, the trial court must review the entire administrative record to determine whether the findings are supported by substantial evidence and if the agency committed any errors of law." (*Whaler's Village Club v. Cal. Coastal Com.* (1985) 173 Cal.App.3d 240, 251, fn. omitted; *Strumsky v. San Diego County Employees Retirement Assn.* (1974) 11 Cal.3d 28, 32; *Bixby v. Pierno* (1971) 4 Cal.3d 130, 143.)

In contrast to quasi-adjudicative decisions, " '[a]cts of an administrative agency that are quasi-legislative in nature, e.g., establishment of regulations to carry out a statutory policy or direction, are not reviewable by administrative mandamus.' [Citation.]" (*City of Arcadia v. State Water Resources Control Bd.* (2006) 135 Cal.App.4th 1392, 1408.) "Review of quasi-legislative determinations is by ordinary mandamus (Code Civ. Proc., § 1085) under the arbitrary and capricious standard . . . ." (*Dominey*, *supra*, 205 Cal.App.3d at p. 736.)

"Whether an administrative action is quasi-legislative or quasi-adjudicative is a question of law." (*Dominey*, *supra*, 205 Cal.App.3d at p. 737, fn. 4.) " 'Generally speaking, a legislative action is the formulation of a rule to be applied to all future cases, while an adjudicatory act involves the actual application of such a rule to a specific set of existing facts.' [Citations.]" (*Id*. at pp. 736-737.) In determining the matter, we must consider "*only* the function performed" by the action in question. (*20th Century Ins. Co. v. Garamendi* (1994) 8 Cal.4th 216, 275.)

19

Here, the Board adopted emergency regulations and then issued curtailment orders contemplated by those regulations. The regulations established minimum flow requirements on three creeks during certain time periods, when certain protected fish were present in the creeks during those time periods, and made any diversion of water from those creeks unreasonable per se under article X, section 2, where the diversion would cause or threaten to cause the flow of water to fall below the minimum flow requirements. The regulations also authorized the Board to issue curtailment orders upon a determination that flows were likely to fall below the minimum flow requirements without curtailment. (Cal. Code Regs., tit. 23, former § 877, subds. (a) & (b).) We have no difficulty concluding the regulations formulated a rule to be applied to future cases, and were therefore legislative in nature. Thus, in determining whether or not the regulations were validly adopted, we "merely ask[] whether the [Board's] action was arbitrary, capricious, or entirely lacking in evidentiary support, or whether the [Board] failed to follow the procedure and give the notices the law requires." (*Kreeft v. City of Oakland* (1998) 68 Cal.App.4th 46, 53.) Of course, "[w]hether a particular regulation is within the scope of authority conferred by the Legislature on an administrative agency is a legal issue we review de novo." (*Light*, *supra*, 226 Cal.App.4th at p. 1482.)

Issuance of the subsequent curtailment orders, however, required a determination by the Board that the flow of water in Deer Creek was likely to fall below the emergency minimum flow requirements, and curtailment was therefore necessary to prevent an unreasonable use of water. This amounted to a quasi-adjudicative application of the emergency regulations to the facts existing in Deer Creek at the time the curtailment orders were issued. Moreover, while administrative mandamus is ordinarily available only if the decision resulted from a "proceeding in which by law a hearing is required to be given," (Code Civ. Proc., § 1094.5, subd. (a)), and as we explain more fully later in the opinion, such a hearing was not required before the Board curtailed Stanford Vina's

20

diversion of water from Deer Creek, "[s]ection 1126, subdivision (c) states that, '[s]ection 1094.5 of the Code of Civil Procedure *shall* govern judicial proceedings under this section.' (Italics added.) This language read in conjunction with section 1126, subdivision (a) ['It is the intent of the Legislature that all issues relating to state water law decided by the board be reviewed in state courts . . . .'], indicates the Legislature's intent that section 1094.5 govern judicial review of all [quasi-adjudicative decisions] relating to state water law. Nothing in subdivision (b) of section 1126 limits the type of proceeding subject to judicial review. We therefore conclude that judicial review is not limited to 'proceedings in which by law a hearing is required.' (Code. Civ. Proc., § 1094.5, subd. (a.).)" (*Phelps v. State Water Resources Control Bd.* (2007) 157 Cal.App.4th 89, 104-105.)

Accordingly, our review of the challenged curtailment orders is by administrative mandamus. Because, as we further explain, Stanford Vina possessed no fundamental vested right to an unreasonable use of water from Deer Creek, our function, "like that of the trial court, is to determine whether the record is free from legal error" and whether the Board's findings are supported by substantial evidence. (*Merrill v. Dept. of Motor Vehicles* (1969) 71 Cal.2d 907, 916; *State Water Resources Control Bd. Cases* (2006) 136 Cal.App.4th 674, 721.)

"Of course, questions of law are subject to de novo review. [Citations.] The proper interpretation of a statute [or regulation], and its application to undisputed facts, is a question of law. [Citation.]" (*State Water Resources Control Bd. Cases*, *supra*, 136 Cal.App.4th at p. 722.) However, "we must 'adhere to the well-settled principle of affording "great weight" to "the contemporaneous administrative construction of [a statute] by those charged with its enforcement. . . ." ' [Citations.] An administrative agency's interpretation of its own regulation is shown even greater deference.

21

[Citations.]"  (*Hardesty v. Sacramento Metropolitan Air Quality Management Dist.* (2011) 202 Cal.App.4th 404, 417-418.)

## III

### *Analysis*

Stanford Vina's appellate arguments, much like its arguments before the trial court, conflate the Board's adoption of the emergency regulations and the subsequent issuance of curtailment orders.  However, as we have explained, a different standard of review applies to each action.  We shall therefore assess the validity of each action under the proper standard of review, addressing Stanford Vina's specific arguments where we deem appropriate.  For example, the company's contention that constitutional guarantees of due process required the Board to hold an evidentiary hearing before making the challenged reasonableness determination, i.e., that any diversion of water from Deer Creek that threatened to drop the flow of water below the emergency minimum flow requirements was per se unreasonable, shall be addressed in connection with our assessment of the validity of the challenged regulations because that is where the reasonableness determination was made.  In contrast, Stanford Vina's argument that the Board's "curtailment actions" amounted to a taking of vested water rights without just compensation shall be addressed in connection with our assessment of the validity of the curtailment orders because, to the extent anything was "taken" from Stanford Vina, it was taken not when the regulations were adopted but when the Board applied the regulations to the facts existing in Deer Creek and ordered the temporary curtailment of diversions.

### A.

### *Validity of the Challenged Regulations*

"Whenever by the express or implied terms of any statute a state agency has authority to adopt regulations to implement, interpret, make specific or otherwise carry out the provisions of the statute, no regulation adopted is valid or effective unless

22

consistent and not in conflict with the statute and reasonably necessary to effectuate the purpose of the statute."  (Gov. Code, § 11342.2.)

### 1. *Consistency with the Board's Grant of Authority*

Because the Board's rulemaking authority "is circumscribed by the substantive provisions of the law governing the agency," we must first determine whether the challenged emergency regulations are consistent with the Board's constitutional and legislative mandate.  (*Henning v. Division of Occupational Saf. & Health* (1990) 219 Cal.App.3d 747, 757-758.)  They are.

Article X, section 2, provides, in relevant part: "The right to water or to the use or flow of water in or from any natural stream or water course in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water.  Riparian rights in a stream or water course attach to, but to no more than so much of the flow thereof as may be required or used consistently with this section, for the purposes for which such lands are, or may be made adaptable, in view of such reasonable and beneficial uses; provided, however, that nothing herein contained shall be construed as depriving any riparian owner of the reasonable use of water of the stream to which the owner's land is riparian under reasonable methods of diversion and use, or as depriving any appropriator of water to which the appropriator is lawfully entitled."

As we have already explained, this constitutional provision sets forth "the overriding principle governing the use of water in California" (*Forni*, *supra*, 54 Cal.App.3d at p. 750), and its enactment in 1928 " 'radically altered water law in [this state] and led to an expansion of the powers of the [Board].' [Citation.]" (*Light*, *supra*, 226 Cal.App.4th at p. 1481.)  "Through subsequent legislation and judicial decisions, 'the function of the [Board] has steadily evolved from the narrow role of deciding priorities

between competing appropriators to the charge of comprehensive planning and allocation of waters.' [Citation.]" (*Ibid*.)

Consistent with article X, section 2, the Legislature added section 100 to the Water Code in 1943. This section provides: "It is hereby declared that because of the conditions prevailing in this State the general welfare requires that the water resources of the State be put to beneficial use to the fullest extent of which they are capable, and that the waste or unreasonable use or unreasonable method of use of water be prevented, and that the conservation of such water is to be exercised with a view to the reasonable and beneficial use thereof in the interest of the people and for the public welfare. The right to water or to the use or flow of water in or from any natural stream or watercourse in this State is and shall be limited to such water as shall be reasonably required for the beneficial use to be served, and such right does not and shall not extend to the waste or unreasonable use or unreasonable method of use or unreasonable method of diversion of water." (§ 100.)

In the same enactment, the Legislature amended section 275 to authorize the Board to "take all appropriate proceedings or actions before executive, legislative, or judicial agencies to prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." (§ 275) The Water Code also "authorizes the Board, in carrying out its statutory duty to administer the state's water resources, to 'exercise the adjudicatory and regulatory functions of the state.' (§ 174.) In that role, the Board is granted 'any powers . . . that may be necessary or convenient for the exercise of its duties authorized by law' (§ 186, subd. (a)), including the authority to 'make such reasonable rules and regulations as it may from time to time deem advisable. . . .' (§ 1058.)" (*Light*, *supra*, 226 Cal.App.4th at pp. 1484-1485.)

Moreover, and particularly relevant here, the Board possesses the statutory authority to adopt emergency regulations "in response to conditions which exist, or are threatened, in a critically dry year immediately preceded by two or more consecutive

24

below normal, dry, or critically dry years or during a period for which the Governor has issued a proclamation of a state of emergency under the California Emergency Services Act . . . based on drought conditions" and where such regulations are "adopted to prevent the waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion, of water, to promote water recycling or water conservation, [or] to require curtailment of diversions when water is not available under the diverter's priority of right . . . ." (§ 1058.5, subd. (a)(1)&(2); Sen. Bill No. 104 (2013-2014 Reg. Sess.) § 10.)

In *Light*, *supra*, 226 Cal.App.4th 1463, our colleagues at the First Appellate District upheld the Board's regulatory authority to adopt a regulation designed to reduce diversions of water from a certain stream system for purposes of frost protection. (*Id.* at pp. 1472-1473.) The regulation was adopted to protect young salmon traveling through the stream system that were being fatally stranded when the water level abruptly dropped due to a number of vineyard operators simultaneously spraying large quantities of water on their crops during cold periods to protect the grapes from frost damage. (*Id.* at pp. 1473-1474.) Although the regulation did not itself regulate the diversion of water for purposes of frost protection, it created certain local programs to monitor the stream system and take " 'corrective actions' to reduce a threat once detected." (*Id.* at pp. 1475-1476.) The regulation also directed diverters to either implement such corrective actions "or cease diverting water for frost protection,' " and declared any diversion of water in violation of the regulation to be " 'an unreasonable method of diversion and use and a violation of . . . section 100 . . . .' " (*Id.* at p. 1476.)

Rejecting the trial court's conclusion that the Board's regulatory authority "was limited, at least as to riparian users, to pursuing enforcement actions in the courts against allegedly unreasonable users, rather than enacting regulations to preclude unreasonable use," the appellate court first noted that "the Board is charged with acting to prevent unreasonable and wasteful uses of water, regardless of the claim of right under which the

25

water is diverted." (*Light*, *supra*, 226 Cal.App.4th at p. 1482.) The court then discussed two appellate decisions that, viewed together, compelled the conclusion the Board possessed the regulatory authority to enact the challenged regulation governing the reasonable use of water. (*Id*. at pp. 1483-1485.)

In *Forni*, *supra*, 54 Cal.App.3d 743, the same appellate court previously upheld a similar regulation declaring the direct diversion of water from a certain river for frost protection during the frost season "constituted an unreasonable method of use within the meaning of the Constitution and Water Code." (*Id*. at p. 752.) The *Forni* court, however, construed this regulatory declaration as "no more than a policy statement which leaves the ultimate adjudication of reasonableness to the judiciary." (*Ibid*.) Returning to *Light*, the court acknowledged the *Forni* court's treatment of the issue "was not a ringing endorsement of the Board's power to enact regulations governing the unreasonable use of water," but explained, "to the extent *Forni*'s ruling was based on the implicit rationale that only the judiciary has the power to declare a particular water use unreasonable, we conclude *Forni* construed the Board's authority too narrowly." (*Light*, *supra*, 226 Cal.App.4th at p. 1483.)

This latter conclusion was based on a prior decision from this court, *California Trout, Inc. v. State Water Resources Control Bd.* (1989) 207 Cal.App.3d 585 (*California Trout*). There, the Legislature enacted a statute "limit[ing] the amount of water that may be appropriated by diversion from a dam in the designated area by requiring that sufficient water first be released to sustain fish below the dam." (*Id*. at p. 599.) We upheld the Legislature's authority to enact such legislation, rejecting the argument that article X, section 2, required a judicial determination as to reasonableness of use. (*Id*. at pp. 622-625.) The proponent of the argument relied on language from *Gin S. Chow v. City of Santa Barbara* (1933) 217 Cal. 673 (*Gin S. Chow*) indicating, "what is a useful and beneficial purpose and what is an unreasonable use is a judicial question depending

26

upon the facts in each case." (*Id*. at p. 706.)  However, as we explained, the court in that case did not hold "the question of reasonableness invariably must be resolved ad hoc, adjudicatively . . . ."  (*California Trout*, *supra*, at p. 624.)  "All that the reasoning in *Gin S. Chow* connotes is that in the absence of an *a priori* rule a court may ascertain whether a use of water is unreasonable from the facts and circumstances of particular cases.  Hence, it is often asserted that '[w]hat constitutes a reasonable use or method of diversion is ordinarily a question of fact.'  [Citation.]  Actually, since what occurs is development of a standard of reasonableness on the facts of the case it should be described as a making of law for the particular case.  [Citation.]  The typical example of such a process is case-by-case determination of the standard of reasonable care in the law of tort.  However, the fact that, ordinarily, the standard of reasonableness is fixed ad hoc does not impel the view that the Legislature has no power to fashion rules concerning reasonableness, e.g., by enacting statutory safety obligations which become the basis of negligence per se." (*Ibid*., italics added.)

Again returning to *Light, supra,* 226 Cal.App.4th 1463, in upholding the Board's regulatory authority to adopt the challenged regulation declaring diversions of water for purposes of frost protection to be per se unreasonable when done in contravention of the regulation, the First Appellate District concluded: "Given the Board's statutory charge to 'prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state' (§ 275) and the recognized power of the Legislature to pass legislation regulating reasonable uses of water (*California Trout*, *supra*, 207 Cal.App.3d at pp. 624-625 . . .), the Board's grant of authority to 'exercise the . . . regulatory functions of the state' (§ 174) necessarily includes the power to enact regulations governing the reasonable use of water." (*Light*, *supra*, 226 Cal.App.4th at pp. 1484-1485.)

27

Similarly, here, the Board adopted regulations setting minimum flow requirements for three creeks during certain time periods, and when certain protected fish were present in the creeks, in order to enable those fish to survive their yearly migration through the creeks during severe drought conditions. Diversions that threatened to drop the flow of water below the minimum flow requirements were declared per se unreasonable and subject to curtailment by the Board. As in *Light, supra,* 226 Cal.App.4th 1463, we conclude the adoption of these regulations was within the Board's regulatory authority as they furthered the Board's constitutional and statutory mandate to "prevent waste, unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." (§ 275; art. X, § 2.) Also like *Light*, we reject Stanford Vina's assertion the Board's authority in this regard was limited by the fact the company manages riparian and pre-1914 water rights. "[T]he Board is charged with acting to prevent unreasonable and wasteful uses of water, *regardless of the claim of right under which the water is diverted*." (*Light*, *supra*, 226 Cal.App.4th at p. 1482, italics added.)

Moreover, the challenged regulations were not ordinary regulations, but were emergency regulations adopted pursuant to the specific statutory authority set forth in section 1058.5, in response to an "unprecedented" drought emergency, requiring "urgent" legislative and administrative action. (Sen. Bill No. 104 (2013-2014 Reg. Sess.) § 1.) Stanford Vina does not dispute in this appeal that drought conditions existed triggering the Board's emergency regulatory authority. Instead, the company argues neither section 1058.5 nor the Governor's declaration of drought emergency gave the Board the authority to "take Stanford Vina's water (without due process and compensation[8]) to

---

[8]     As stated previously, we address Stanford Vina's "takings" claim in connection with our assessment of the validity of the curtailment orders.

enhance public trust fishery interests, nor did they authorize the [Board] to redefine and expand the definitions of waste and unreasonable use to include serving public trust fishery resources as an acceptable regulatory goal." We are not persuaded.

First, the assertion that the survival of protected species of fish is not an appropriate consideration in water use regulation is contradicted by the holding in *Light, supra,* 226 Cal.App.4th 1463. *Light* specifically considered fish survival. There, the challenged regulation limited diversions for frost protection because simultaneous diversions of water for that purpose by several vineyard operators abruptly reduced the water level in the stream system, thereby fatally stranding juvenile salmon. (*Light*, *supra*, 226 Cal.App.4th at p. 1472; see also *California Trout*, *supra*, 207 Cal.App.3d at p. 599 [challenged statute limited diversions from dams by requiring the release of sufficient water to sustain fish below the dam].) Here, the challenged emergency regulations limited diversions, with some exceptions, where such diversions would cause or threaten to cause the flow of water to drop below emergency minimum flow requirements established to allow protected salmon and steelhead to survive their migration through the stream system. In both cases, fish survival is an appropriate consideration in determining what is or is not an "unreasonable use, unreasonable method of use, or unreasonable method of diversion of water in this state." (§ 275; see also § 1058.5, subd. (a)(1); art. X, § 2.)

Stanford Vina also argues the Board was required to hold an evidentiary hearing before making this reasonableness determination. Such a requirement, the company argues, flows both from the due process guarantees of the federal and California constitutions and from article X, section 2, itself. These arguments are similar to those advanced and rejected in *California Trout, supra,* 207 Cal.App.3d 585. While we acknowledge that in the absence of a per se rule of unreasonableness, the determination of whether Stanford Vina's water use was reasonable or not would necessarily have been

29

determined ad hoc, adjudicatively, this does not mean due process requires the Board to hold an evidentiary hearing before engaging in the *legislative* function of promulgating a regulation defining diversions of water under certain emergency circumstances to be per se unreasonable. Such a requirement would turn the regulatory process on its head. Nor did the Board violate article X, section 2 by failing to hold such a hearing. As we held in *California Trout*, the Legislature may, consistent with this constitutional provision, legislate per se rules of unreasonable use. (*California Trout*, *supra*, 207 Cal.App.3d at p. 624.) So too may the Board. (*Light*, *supra*, 226 Cal.App.4th at pp. 1484-1485.)

## 2. *Reasonable Necessity*

Turning to the second component of our review of the challenged regulations' validity, i.e., whether or not they are "reasonably necessary" (Gov. Code, § 11342.2), this determination "generally does implicate the agency's expertise" and "receives a much more deferential standard . . . ." (*Henning v. Division of Occupational Saf. & Health*, *supra*, 219 Cal.App.3d at p. 758.) "Ordinarily, absent a plain constitutional mandate, a conflict in public policy between the view of the judiciary and the Legislature [or, as here, the Board] must be resolved in favor of the latter. [Citation.] Where various alternative policy views reasonably might be held whether the use of water is reasonable within the meaning of article X, section 2, the view enacted by the Legislature [or Board] is entitled to deference by the judiciary. An invitation to substitute the policy view of a court in this circumstance for a reasonable policy enacted in a statute [or regulation] is an invitation to return to the benighted days of substantive due process." (*California Trout*, *supra*, 207 Cal.App.3d at pp. 624-625; *Light*, *supra*, 226 Cal.App.4th at p. 1485 ["the Board's regulatory authority is coincident with that of the Legislature"].)

We conclude the Board's determination that, as the trial court put it, "allowing diversions to reduce flows below the minimum, 'belly-scraping' amounts necessary for fish migrations and survivability would be 'unreasonable,' "

was not arbitrary, capricious, or entirely lacking in evidentiary support. Nor does Stanford Vina assert in this appeal that the Board failed to follow the procedure applicable to adoption of emergency regulations or give required notices. Indeed, the company submitted comments opposing adoption of the regulations and appeared at the public hearings held before the Board.

We therefore have no basis upon which to override the Board's determination that the minimum flow requirements set forth in the challenged regulations were reasonably necessary to prevent an unreasonable use of water within the meaning of article X, section 2, and any diversion that threatened to reduce the flow of water in the named creeks below the required minimum flows would constitute such an unreasonable use of water.[9]

## B.

### *Validity of the Challenged Curtailment Orders*

Having concluded the Board's adoption of the emergency regulations was valid, we must now determine whether or not the Board properly implemented those regulations by issuing the challenged curtailment orders. It did.

As we have already explained, our review of the curtailment orders is by administrative mandamus. We have also explained that whether the substantial evidence or independent judgment standard of review applies turns on whether or not the decision

---

[9] This conclusion makes it unnecessary for us to address Stanford Vina's additional argument that the Board abused its authority by unlawfully asserting the public trust doctrine. As the Court of Appeal explained in *Light*, the public trust doctrine exists "alongside the rule of reasonableness." (*Light*, *supra*, 226 Cal.App.4th at p. 1479.) Each doctrine independently limits the private use of water in this state. Having concluded the challenged regulations limiting diversions of water from Deer Creek were authorized by article X, section 2, we need not determine whether they would also have been authorized by the public trust doctrine.

31

to curtail diversions from Deer Creek substantially affected a fundamental vested right possessed by Stanford Vina. (See *Whaler's Village Club v. Cal. Coastal Com.*, *supra*, 173 Cal.App.3d at p. 251.) We now explain why issuance of the challenged curtailment orders substantially affected no such right.

Stanford Vina claims the existence of a fundamental vested right to Deer Creek's water by virtue of the fact that it "manages its landowners' senior riparian and pre-1914 water rights to Deer Creek flows which are appurtenant to their lands." The Board does not dispute this fact. However, as our Supreme Court has explained, article X, section 2, declares: "Riparian rights attach to, *but to no more than* so much of the flow as may be required or used consistently with this section of the Constitution." (*Peabody v. City of Vallejo* (1935) 2 Cal.2d 351, 367, italics added.) "Such an interest consists in their right to the *reasonable* use of the flow of the water. Their riparian rights attach to no more of the flow of the stream than that which is required for such use. . . . There is now no provision of law which authorizes an unreasonable use or endows such use with the quality of a legally protectible interest merely because it may be fortuitously beneficial to the lands involved." (*Joslin*, *supra*, 67 Cal.2d at pp. 143-144.) We have already explained the Board's emergency regulations defining as unreasonable any diversion of water that threatened to drop the flow of Deer Creek below the emergency minimum flow requirements was a valid exercise of the Board's legislative authority to regulate the reasonable use of water. Thus, Stanford Vina possessed no vested right, fundamental or otherwise, to divert water from Deer Creek in contravention of the emergency regulations.

We shall therefore apply the substantial evidence standard of review in assessing the validity of the challenged curtailment orders. Under this standard, we "must review the entire administrative record to determine whether the findings are supported by

substantial evidence and if the agency committed any errors of law." (*Whaler's Village Club v. Cal. Coastal Com.*, *supra*, 173 Cal.App.3d at p. 251.)

Section 877 of the emergency regulations provided for issuance of a curtailment order, with certain exceptions not applicable here, where "diversions . . . would cause or threaten to cause flows to fall beneath the drought emergency minimum flows listed in subdivision (c) . . . ." (Cal. Code Regs., tit. 23, former § 877.) Stanford Vina does not challenge the sufficiency of the evidence supporting the Board's conclusion the curtailed diversions would have caused or threatened to cause the flow of water to fall below the emergency minimum flow requirements. Instead, as previously discussed, the company attacks the Board's decision to adopt the emergency minimum flow requirements in the first place. Thus, Stanford Vina challenges the regulations, not the Board's application of the regulations to the facts existing in Deer Creek at the time the curtailment orders were issued. We have already affirmed the Board's adoption of the regulations. And we find no fault with the Board's application of the regulations to the facts. Substantial evidence supports the Board's conclusion the curtailed diversions would have caused or threatened to cause the flow of water in Deer Creek to fall below the emergency minimum flow requirements.

Turning to the question of whether the Board committed any errors of law, Stanford Vina does not specifically point to any purported errors relating to the issuance of the curtailment orders themselves, perhaps as a consequence of treating adoption of the regulations and issuance of the curtailment orders as a single action.

However, we address Stanford Vina's argument that the "curtailment actions" amounted to a taking of vested water rights without just compensation as a challenge to the legality of the curtailment orders because any such taking occurred not when the regulations were adopted, but when those regulations were applied to curtail Stanford Vina's diversions of water from Deer Creek. This takings claim fails for the same reason

33

we rejected Stanford Vina's argument regarding application of the independent judgment standard of review: Stanford Vina possessed no vested right to divert water from Deer Creek in contravention of the emergency regulations. As stated by our Supreme Court in *Gin S. Chow*: "There is a well recognized and established distinction between a 'taking' or 'damaging' for public use and the regulation of the use and enjoyment of a property right for the public benefit. The former falls within the realm of eminent domain, and the latter within the sphere of the police power. That the constitutional amendment now under consideration is a legitimate exercise of the police power of the state cannot be questioned." (*Gin S. Chow*, *supra*, 217 Cal. at p. 701.) "[S]ince there was and is no property right in an unreasonable use, there has been no taking or damaging of property by the deprivation of such use and, accordingly, the deprivation is not compensable." (*Joslin*, *supra*, 67 Cal.2d at p. 145.)

Finally, we also reject Stanford Vina's assertions the Board's actions violated a prior judicial decree adjudicating the company's water rights and also violated the rule of priority described earlier in this opinion. While we acknowledge Stanford Vina's previously-adjudicated right to use roughly 66 percent of the flow of Deer Creek, this right is limited by the rule of reasonableness for the reasons discussed at length above. We agree with the trial court's determination that although "[t]he decree is conclusive as to the rights of all existing claimants upon the stream system lawfully embraced in the determination" (§ 2773), it does not prevent the Board from adopting regulations and issuing curtailment orders to prevent an unreasonable use of water under article X, section 2. (See *In re Waters of Long Valley Creek Stream System* (1979) 25 Cal.3d 339, 358-360.)

Nor did the Board violate the rule of priority. Unlike *El Dorado Irrigation Dist. v. State Water Resources Control Bd.* (2006) 142 Cal.App.4th 937 (*El Dorado Irrigation*), relied upon by Stanford Vina, the Board in this case did not subvert the rule of priority by

34

imposing a condition on a senior appropriator that it did not also impose on more junior appropriators. (*Id*. at p. 969.) Here, the Board declared all diversions of water from Deer Creek unreasonable during certain time periods, and when protected fish were present in the creek, where such diversions threatened to drop the flow of water below the minimum flow required to allow the fish to survive their migration through the creek. The Board then implemented this unreasonableness determination by curtailing all diversions that threatened to violate the minimum-flow requirements. Stanford Vina does not argue any water rights holders junior to it were not similarly restricted by curtailment orders, but instead argues the Board was not authorized to "elevat[e] public trust uses of water," i.e., survival of threatened fish, "to a super-senior priority." This argument is belied by our discussion of the rule of priority in *El Dorado Irrigation*: "Of course, the rule of priority is not absolute, nor is the Board without power to act contrary to that rule in appropriate circumstances. Sometimes, a competing principle or interest may justify the Board's taking action inconsistent with a strict application of the rule of priority. [¶] For example, the California Constitution provides that all water use must be reasonable. [Citation.] '[T]he rule of reasonable use as enjoined by . . . the Constitution applies to all water rights enjoyed or asserted in this state . . . .' [Citation.] Thus, 'no one can have a protectible interest in the unreasonable use of water' [citation], and when the rule of priority clashes with the rule against unreasonable use of water, the latter must prevail." (*Id*. at pp. 965-966, fn. omitted.) For all of the reasons already expressed, the Board was well-within its authority to determine diversions that threatened to violate the emergency minimum flow requirements constituted an unreasonable use of water. Stanford Vina's senior water rights did not exempt its diversions from curtailment.

## DISPOSITION

The judgment is affirmed. Respondents State of California, State Water Resources Control Board, State Water Resources Control Board Members Felicia

35

Marcus, Doreen D'Adamo, Frances Spivy-Weber, Steven Moore, and Tam Doduc are entitled to costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)

                                                                               /s/

HOCH, J.

We concur:

        /s/

RAYE, P. J.

        /s/

DUARTE, J.